IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
EASTERN DIVISION

| | | |
|---|---|---|
| JOANNE ST PIERRE and THOMAS ST PIERRE, individually and on behalf of a class of those similarly situated, | ) ) ) | No. _____ |
| | ) | CLASS ACTION COMPLAINT |
| Plaintiffs, | ) ) | JURY TRIAL DEMANDED |
| v. | ) ) | |
| SUPERVALU, INC., NEW ALBERTSON'S, INC., and AB ACQUISITION LLC, | ) ) ) | |
| | ) | |
| Defendants. | ) | |

Plaintiffs Joanne and Thomas St Pierre on behalf of a class of similarly situated people (further defined below) alleges the following upon personal knowledge as to themselves and their own acts and as to all other matters upon information and belief, based upon, among other things, their attorneys' investigation.

## I.    INTRODUCTION

1.     A data breach is not an act of God.  It is, almost always, the predictable and preventable result of one or more security failures.  According to a 2014 report by the Online Trust Alliance—an industry group of leading cybersecurity experts—89% of data breaches in 2013 were preventable.  Similarly, Verizon Enterprise Solution's 2014 Data Breach Investigations Report—which examined over 63,000 security incidents with the assistance of dozens of industry and government stakeholders—found that "nearly every incident involve[d] some element of human error."  The Verizon report found that 92% of all attacks fell into one of nine predictable (and, thus, preventable) patterns.

2.      Defendants Supervalu, Inc. ("Supervalu"), New Albertson's, Inc. ("New Albertson's"), and AB Acquisition LLC ("AB Acquisition") failed to prevent a significant data breach (the "Breach") that compromised customers' personal financial data at a number of U.S. supermarket and liquor stores (the "Affected Stores"; described further below).  As a result of Defendants' lapses, criminal hackers were able to obtain access to credit and debit card data from members of the "Class": customers who used their payment cards at the Affected Stores between June 22, 2014 and July 18, 2014 (the "Relevant Period").

3.      The Breach was avoidable.   On August 18, 2014, Infosecurity Magazine published a story titled "Security Researchers: Supervalu [Point-of-Sale] Breach 'Completely Avoidable'," in which it quoted a number of security professionals who described the breach as "totally avoidable" and the result of "pure negligence," by "an incompetent retail CEO" and "gross[ly] negligen[t]" "senior IT management."

4.      During the Relevant Period, Defendants failed to disclose that their subpar security systems placed Class members' financial data at risk.  Had Class members received full disclosure of the security risks to which they were exposed, they would have paid less for the products they purchased or not purchased those products at all.  Now that the Breach has occurred, Class members have been further damaged by the need to take affirmative measures to protect against fraudulent charges and other acts of identity theft.

II.   PARTIES

5.      Plaintiffs Joanne and Thomas St Pierre ("Plaintiffs") are husband and wife and were, at all relevant times, residents of Massachusetts.  On June 29, 2014, July 3, 2014, and July 11, 2014, Plaintiffs used their joint credit card to make purchases at a Shaw's-brand store in Melrose, Massachusetts. Shaw's stores are owned and operated by New Albertson's, a subsidiary

of AB Acquisition.  Upon information and belief, Plaintiffs' credit card data was stolen as part of the Breach.  As a result of the Breach, Plaintiffs are now forced to monitor their financial accounts for fraudulent charges and other indications of identity theft.  Had Plaintiffs known that Defendants did not abide by industry-standard cybersecurity practices, they would have paid less or not shopped at Shaw's at all.

6.      Defendant Supervalu, Inc. (Supervalu) is a Delaware corporation with a corporate headquarters in Eden Prarie, Minnesota.  Supervalu operates stores under the Hornbacher's, Cub Foods, Farm Fresh, Shop 'N Save, and Shoppers brands.   Supervalu provides information technology ("IT") services to stores operated by AB Acquisition LLC ("AB Acquisition") and its affiliates, pursuant to certain agreements (the "Transition Services Agreements").   Supervalu entered into the Transition Services Agreements with AB Acquisition and its affiliates, in connection with Supervalu's March 2013 sale of New Albertson's, Inc. ("New Albertson's") to AB Acquisition.  As set forth below, AB Acquisition operates Albertsons-branded stores under its subsidiary Albertson's LLC (the "Albertson's Stores"), and ACME Markets, Jewel-Osco, Shaw's and Star Market-branded stores under its New Albertson's subsidiary (collectively, the "New Albertson's Stores" and with the Albertson's Stores, the "AB Acquisition Stores").  Many of the AB Acquisition Stores were affected by the Breach.  Supervalu acted as an agent of AB Acquisition and New Albertson's in providing IT services to stores owned and operated by those companies.

7.      Defendant New Albertson's, Inc. ("New Albertson's") is a Delaware corporation with a corporate headquarters in Boise, Idaho.  New Albertson's operates stores under the ACME Markets, Jewel-Osco, Shaw's and Star Market brands.  New Albertson's is a subsidiary of AB Acquisition LLC.

8.     Defendant AB Acquisition LLC ("AB Acquisition") is a Delaware corporation with a corporate headquarters in Boise, Idaho.  AB Acquisition is the parent of New Albertson's. AB Acquisition is also the parent of Albertson's LLC, which operates stores under the Albertsons brand. According to an August 14, 2014 press release by AB Acquisition, AB Acquisition "operates Albertsons stores under Albertson's LLC and ACME Markets, Jewel-Osco, and Shaw's and Star Markets under New Albertson's, Inc."

## III.     JURISDICTION AND VENUE

9.     This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because members of the proposed Class are citizens of states different from Defendants' home states, and the aggregate amount in controversy exceeds $5,000,000.

10.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a) because a substantial part of the events or omissions giving rise to these claims occurred in this District, and Defendants have caused harm to class members residing in this District.

## IV.     SUBSTANTIVE ALLEGATIONS

### A. Defendants' Customers' Data Was Compromised

11.     On August 14, 2014, Supervalu issued a press release announcing that "it experienced a criminal intrusion into the portion of its computer network that processes payment card transactions for some of its retail food stores, including some of its associated stand-alone liquor stores.  This criminal intrusion may have resulted in the theft of account numbers, and in some cases also the expiration date, other numerical information and/or the cardholder's name, from payment cards used at some point of sale systems at some of the Company's owned and franchised stores."

12.     Supervalu stated that "the payment cards from which such cardholder data may have been stolen were used during the period of June 22 (at the earliest) through July 17 (at the

latest), 2014" at a number of stores (the "Affected Supervalu Stores"). A full list of the Supervalu Affected Stores is attached hereto as Exhibit A and incorporated by reference as though fully set forth herein.

13.     In its August 14 release, Supervalu also stated that "[s]ome stores owned and operated by Albertson's LLC and New Albertson's, Inc. suffered a related criminal intrusion." (As noted above, Supervalu is responsible for providing IT services to Albertson's Stores and New Albertson's Stores).

14.     Also on August 14, 2014, AB Acquisition issued a press release stating that "AB Acquisition LLC, which operates Albertsons stores under Albertson's LLC and ACME Markets, Jewel-Osco, and Shaw's and Star Markets under New Albertson's, Inc., recently learned of an unlawful intrusion to obtain credit and debit card payment information in some of its stores.  The appropriate federal law enforcement authorities have been notified, and AB Acquisition is working closely with its third party IT services provider, SUPERVALU, to better understand the nature and scope of the incident."  AB Acquisition's release stated further that "it appears that the period of unauthorized access may have started on June 22, 2014 (at the earliest) and ended on July 17, 2014 (at the latest)."

15.     According to the AB Acquisition release, the following AB Acquisition Stores were affected by the breach: "Albertsons stores in Southern California, Idaho, Montana, North Dakota, Nevada, Oregon, Washington, Wyoming and Southern Utah," (collectively, the "Affected Albertson's Stores") as well as "ACME Markets in Pennsylvania, Maryland, Delaware and New Jersey; Jewel-Osco stores in Iowa, Illinois and Indiana; and Shaw's and Star Markets stores in Maine, Massachusetts, Vermont, New Hampshire and Rhode Island." (collectively, the "Affected New Albertson's Stores" and with the Affected Albertson's Stores, the "Affected AB

Acquisition Stores."). The Affected AB Acquisition Stores and the Affected Supervalu Stores are, collectively, the Affected Stores.

### B. Defendants Could Have Prevented the Breach

16.    For several reasons, it is highly likely that—as in most data breaches—incompetence and negligence by the target companies, *i.e.*, the Defendants, caused the Breach.

17.    First, the widely reported breaches of point-of-sale systems at, among others, Target, Neiman Marcus, Michaels Stores, and P.F. Chang's should have put Defendants on notice to ensure that their own systems were not vulnerable to a similar attack.  In an August 15, 2014 story, the New York Times quoted Steve Hultquist, an executive at RedSeal Networks, a security firm, as stating that the Breach in this case "looks much the same as the attack that impacted Target last year."  The Target breach was first reported in December 2013.  The Target breach affected tens of millions of people, was the subject of a Congressional investigation, led to dozens of lawsuits and resulted in the resignations of Target's CEO and its Chief Information Officer.

18.    As an August 18, 2014 story by Infosecurity Magazine explained, the Target, Neiman Marcus and Michael Stores breaches have "shown that criminals can rather easily leverage existing security weaknesses in corporate networks to gain access to sensitive data and critical [point-of-sale] systems without being detected.  Not making changes to account for this given the ongoing tsunami of headlines about such breaches is equivalent to pure negligence," according to researchers interviewed by the magazine.

19.    Infosecurity Magazine quoted security expert, Mark Bower, vice president of product management and solutions architecture at Voltage Security, as stating, "By now, every retailer is aware of the risks of malware in [point-of-sale systems], the impact, and the simple

fact that being compliant to [Payment Card Industry Data Security Standards] doesn't equate to mitigating advanced threats that no doubt again stole the gold in this case … The only way to neutralize this risk is to avoid any sensitive data passing in and through the vulnerable [point-of-sale system] or retail IT. **Hundreds of thousands of merchants already do this today with proven approaches** using the latest innovations in data-centric security and are able to brush off such attacks like water off a duck's back. **These risks are totally avoidable** – and at a fraction of the cost of the fallout from dealing with the consequences."

20.     Another security expert, Philip Lieberman, president at Lieberman Software, echoed Bower's view, stating "This is another example of an incompetent retail CEO incapable of providing leadership and process to secure their organization …  As in the Target case, the board should fire both the CEO and the senior IT management that allowed this to occur for **gross negligence**. **Technology and processes exist to eliminate this class of problem, but the CEO chose not to or could not implement them due to lack of knowledge or will**."

21.     Second, the length of time that Defendants' security was compromised strongly suggests that Defendants were failing to comply with the Payment Card Industry Data Security Standard ("PCI DSS").

22.     PCI DSS is an industry-standard information-security standard for organizations that handle cardholder information for the major debit, credit, prepaid, e-purse, ATM, and point-of-sale cards.

23.     Among other policies and procedures, PCI DSS Requirement 10 requires organizations to "Regularly Monitor and Test Networks."  This includes establishing audit logs that track access to all systems and conducting a regular review of those logs.  Requirement 10.6 states that organizations must "Review logs and security events for all system components to

identify anomalies or suspicious activities" and states that "Many breaches occur over days or months before being detected.  Checking logs daily minimizes the amount of time and exposure of a potential breach."

24.    PCI DSS Requirement 10.6.1 elaborates on the logs that should be reviewed daily:  "All security events; Logs of all system components that store, process, or transmit [cardholder data] and/or [sensitive authentication data], or that could impact the security of [cardholder data] and/or [sensitive authentication data]; Logs of all critical system components; Logs of all servers and system components that perform security functions (for example, firewalls, intrusion-detection systems/intrusion-prevention systems (IDS/IPS), authentication servers, e-commerce redirection servers, etc.)."

25.    Defendants' failure to detect the Breach for almost a month suggests that they were failing to implement the daily log monitoring requirements of PCI DSS.  In a June 12, 2014 statement regarding an earlier data breach, John Harmon, the Principal Consultant of Sword & Shield Enterprise Security stated, that "Following the PCI DSS requirements, particularly the requirement for daily log monitoring will limit your breach to one or two days, not months."

26.    Infosecurity Magazine quoted, "Eric Chiu, president and co-founder of HyTrust," who "said that of particular concern is the time it takes for an organization to discover that it has been compromised": "'The possible Supervalu breach underlines one of the key challenges companies are facing when it comes to security: it takes weeks to months before they even notice they have been breached,' [Hiu] said. 'It is critical that organizations change their security approach—it should be top of mind for every organization today. Companies must assume they have already been breached, and begin looking at policies and technology that can prevent

attackers from getting access to sensitive or regulated data, even if the attackers are inside the network.'"

### C. Supervalu Is Richly Compensated For Its Provision of Services to AB Acquisition Stores

27.     As set forth above, Supervalu provides IT services to stores operated by AB Acquisition pursuant to the Transition Services Agreements that Supervalu entered into with AB Acquisition and its affiliates, in connection with Supervalu's sale of New Albertson's to AB Acquisition.  According to its most recent Form 10-Q, Supervalu received at least $84 million in payments from AB Acquisition and its affiliates under the Transition Services Agreements in the first quarter of 2014.

28.     Upon information and belief, the cost of AB Acquisition's and New Albertson's payments to Supervalu under the Transition Services Agreements are passed on, in whole or part, to AB Acquisition's and New Albertson's customers.

### D. Plaintiffs and the Class Have Been Harmed

29.     During the Relevant Period, Defendants failed to disclose to the Class any of the security weaknesses described above.  Had Class members received full disclosure of the security risks to which Defendants were exposing them, they would have paid less for the products that they purchased or not purchased them at all.

30.     Plaintiffs and the Class have been further harmed because, as a result of the Breach, cyber-criminals now possess their personal financial information.  While credit card companies offer protection against unauthorized charges, the process is long, costly, and frustrating.  Physical cards must be replaced, credit card information must be updated on all automatic payment accounts, and victims must add themselves to credit fraud watch lists, which

substantially impairs victims' ability to obtain additional credit.  Information about Plaintiffs and the other Class Members may also be used to harass or stalk them.

### E.  Credit Monitoring Does Not Solve The Problem

31.     According to their press releases, AB Acquisition and Supervalu are offering customers one year of credit monitoring services through AllClear ID.  This does not make Plaintiffs or Class members whole.

32.     An August 15, 2014 story in the Chicago Tribune discussed AB Acquisition and Supervalu's offer of credit monitoring services and explained, "Payment card breaches have nothing to do with credit reports.  It's like losing your keys in the street at night and searching for them under the lamppost a block away because the light is better there.  Searching is easier but it won't help you solve the problem."  The Tribune quoted John Ulzheimer, a credit expert with CreditSesame.com, who stated that Defendants' approach is "a huge waste of time and can provide a false sense of security … In fact, it's akin to the retailer telling their customers to bug off."  Ulzheimer went on to say "Credit monitoring does nothing to identify or alert you when someone has compromised your existing payment information … That type of fraudulent activity does not show up on a credit report, so credit monitoring is woefully inadequate."

33.     The Tribune also quoted Paul Stephens, of the Privacy Rights Clearinghouse, who stated "[Credit monitoring] makes no sense at all ... I can't even envision a situation where credit monitoring would be helpful where it's strictly a breach of payment card information."  That's because "[f]raudulent use of a stolen card number won't show up on a credit report because they don't show individual charges.  And credit reports don't show debit card information at all."  Moreover, according to Stephens "a credit monitoring service is likely to hassle you after the free 12 months of service expire[.]"

V.    **CLASS ALLEGATIONS**

34.    Plaintiffs brings this action on behalf of themselves and the following Class, pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure:

>    All persons in the United States who used a debit or credit card at an Affected Store during the Relevant Period.

35.    The Class excludes the officers and directors, and current or former employees, as well as immediate family members thereof, of Defendants and their parents, subsidiaries, and affiliates.

36.    The Class includes as a subclass (the "AB Acquisition Subclass"):

>    All Class members who used a debit or credit card at an Affected AB Acquisition Store during the Relevant Period.

37.    The Class also includes as a subclass (the "New Albertson's Subclass"):

>    All Class members who used a debit or credit card at an Affected New Albertson's Store during the Relevant Period.

38.    Plaintiffs reserve the right to amend the definition of this proposed Class, including by adding additional subclasses.

39.    The Class is so numerous that joinder of all members is impracticable.  An August 18, 2014 story in the Minneapolis / St. Paul Business Journal quoted Evan Francen, president of the information security management company FRSecure as estimating that "millions of card numbers were probably stolen."

40.    There are questions of fact or law common to the Class.  These questions include, but are not limited to:

>    a.    Whether Defendants had a duty to disclose failures to comply with industry-standard cybersecurity practices;
>
>    b.    Whether Defendants complied with industry-standard cybersecurity practices;

    c.   Whether Defendants concealed their noncompliance with industry-standard cybersecurity practices from their customers; and

    d.   Whether Defendants' failure to comply with industry-standard cybersecurity practices caused the Breach.

41.    Plaintiffs' claims are typical of the Class and Plaintiffs are not subject to any unique defenses.

42.    Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs' interests do not conflict with the interests of the Class. Plaintiffs have retained competent counsel experienced in class action litigation of this type. Plaintiffs' counsel will fairly and adequately protect the interests of the Class.

43.    Certification is appropriate under Federal Rule of Civil Procedure 23(b)(3) because questions of law or fact common to the Class predominate over any questions affecting only individual members.

44.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Individual lawsuits are economically infeasible and procedurally impracticable.

45.    Plaintiffs know of no difficulty to be encountered in the management of this case that would preclude its maintenance as a class action.

## VI.   CLAIMS ALLEGED AND RELIEF SOUGHT

46.    The following chart summarizes the claims brought against each Defendant:

| | Supervalu | AB Acquisition | New Albertson's |
|---|---|---|---|
| **Class** | Negligence (1)<br>Strict Liability (2)<br>Breach of Fiduciary Duty (3)<br>Minnesota Consumer Fraud Act (4) | | |
| **AB Acquisition Subclass** | Unjust Enrichment (11) | Negligence (5)<br>Strict Liability (6)<br>Breach of Fiduciary Duty (7)<br>Breach of Implied Contract (8)<br>Negligent Misrepresentation (9) | |

| | | Idaho Consumer Protection Act (10) | |
|---|---|---|---|
| **New Albertson's Subclass** | | | Negligence (12)<br>Strict Liability (13)<br>Breach of Fiduciary Duty (14)<br>Breach of Implied Contract (15)<br>Negligent Misrepresentation (16)<br>Idaho Consumer Protection Act (17) |

## A. Claims Asserted By The Class Against Supervalu

## COUNT 1
### Negligence

47.    Plaintiffs and the Class incorporate by reference the foregoing allegations as though fully set forth herein.

48.    Supervalu owed a duty to Plaintiffs and the Class to exercise reasonable care in safeguarding and protecting the personal and financial information in Defendants' possession from being compromised, lost, stolen, misused, and or/disclosed to unauthorized parties.  This duty included, among other things, designing, maintaining, and testing Defendants' security systems to ensure that Plaintiffs and Class member's financial information was adequately secured and protected.  Supervalu further had a duty to implement processes that would detect a security breach in a timely manner.

49.    Supervalu breached this duty to exercise reasonable care in safeguarding and protecting Plaintiffs and Class members' financial data by failing to adopt, implement, and maintain adequate security measures to safeguard data; failing to adequately monitor the security of point-of-sale systems; allowing unauthorized access to Plaintiffs and Class members' data; and failing to recognize in a timely manner that security had been breached.

50.    Supervalu's failures to comply with industry standards, such as PCI DSS, are evidence of its negligence in failing to exercise reasonable care in safeguarding and protecting the customer data in Defendants' possession.

51.     But for Supervalu's wrongful and negligent breach of duties owed to Plaintiffs and other Class members, their financial data would not have been compromised.

52.     The injury and harm suffered by Plaintiffs and Class members was the reasonably foreseeable result of Supervalu's failure to exercise reasonable care in safeguarding and protecting the financial data collected from customers.  Supervalu knew or should have known that the systems and technologies for processing and securing customers' data had security vulnerabilities.

**COUNT 2**
**Strict Liability**

53.     Plaintiffs and the Class incorporate by reference the foregoing allegations as though fully set forth herein.

54.     Supervalu failed adequately to safeguard the private and confidential financial and personal information of its customers entrusted to it in the course of purchases made with debit cards and credit cards during the Relevant Period.

55.     Payment by debit or credit card increasingly is a necessity for consumers.  Lack of such means of payment increasingly limits their purchase options and bargaining power. Retailers like Defendants are eager to accept credit cards—and pay credit card companies handsomely for that privilege—because customers using credit cards spend more money than those paying with cash.

56.     Reliance on electronic means of payment and other recording of personal identity and financial data has left consumers increasingly susceptible to personal data and identity theft, the adverse consequences of which are also of increasing severity.

57.     Safeguarding private and confidential data of others in their possession is solely within the control of the recipients of that data, who are best able to distribute the cost of maintaining the security of that data and the consequences of the breach of such security.

58.     Plaintiffs and Class members confided and entrusted their private and confidential financial and personal information to Defendants solely for the purpose of effectuating payment for purchases made from Defendants and with the expectation that Defendants would strictly maintain the confidentiality of the information and safeguard it from theft or misuse.

59.     Plaintiffs and Class members did not contribute in any way to the breach of Defendants' information technology systems or the compromise or theft of their private and confidential financial and personal data.  Accordingly, Supervalu should be held strictly liable for the loss and damage suffered by Plaintiffs and Class members resulting from Supervalu's failure to safeguard and maintain the confidentiality of their financial and personal data.

## COUNT 3
## Breach of Fiduciary Duty

60.     Plaintiffs and the Class incorporate by reference the foregoing allegations as though fully set forth herein.

61.     Plaintiffs and Class members entrusted private and confidential financial and personal information to Supervalu and placed trust and confidence in Supervalu in order to make payments.

62.     Supervalu had the benefit of a disparity of position and control and Plaintiffs and Class members placed trust and confidence in Supervalu.

63.     Supervalu had a duty to maintain the confidentiality of the private and confidential financial and personal information, to safeguard and protect it from misuse by unauthorized persons.

64.    Supervalu breached this duty by failing to take necessary measures to maintain the confidentiality of Plaintiffs and Class members' private and confidential financial and personal information and to safeguard and protect it from misuse by unauthorized persons.

65.    The damages sustained by Plaintiffs and Class members as described above were the direct and proximate result of Supervalu's breach of this fiduciary duty.

**COUNT 4**
**Minnesota Consumer Fraud Act**

66.    Plaintiffs and the Class incorporate by reference the foregoing allegations as though fully set forth herein.

67.    Plaintiffs, the Class and Supervalu are "persons" within the meaning of Minn. Stat. § 325F.-68(3).

68.    Plaintiffs and the Class were injured by Supervalu's use and employment of deceptive acts or practices in connection with the sale of merchandise, including, among other things, uniformly failing to disclose its noncompliance with industry-standard cybersecurity practices.

69.    As a direct and proximate result of Supervalu's deceptive acts and practices, Plaintiffs and the Class overpaid for the goods and services that they purchased and have been damaged thereby.

**B. Claims Asserted By The AB Acquisition Subclass Against AB Acquisition**

**COUNT 5**
**Negligence**

70.    Plaintiffs and the AB Acquisition Subclass (the "AB Acquisition Plaintiffs") incorporate by reference the foregoing allegations as though fully set forth herein.

16

71.     AB Acquisition owed a duty to the AB Acquisition Plaintiffs to exercise reasonable care in safeguarding and protecting the personal and financial information in its possession from being compromised, lost, stolen, misused, and or/disclosed to unauthorized parties.  This duty included, among other things, designing, maintaining, and testing its security systems to ensure that the AB Acquisition Plaintiffs' financial information was adequately secured and protected. AB Acquisition further had a duty to implement processes that would detect a security breach in a timely manner.

72.     AB Acquisition breached this duty to exercise reasonable care in safeguarding and protecting the AB Acquisition Plaintiffs' financial data in its possession by failing to adopt, implement, and maintain adequate security measures to safeguard data; failing to adequately monitor the security of point-of-sale systems; allowing unauthorized access to the AB Acquisition Plaintiffs' data; and failing to recognize in a timely manner that security had been breached.

73.     AB Acquisition's failures to comply with industry standards, such as PCI DSS are evidence of its negligence in failing to exercise reasonable care in safeguarding and protecting the customer data in its possession.

74.     But for AB Acquisition's wrongful and negligent breach of duties owed to the AB Acquisition Plaintiffs, their financial data would not have been compromised.

75.     The injury and harm suffered by the AB Acquisition Plaintiffs was the reasonably foreseeable result of AB Acquisition's failure to exercise reasonable care in safeguarding and protecting the financial data collected from customers.  AB Acquisition knew or should have known that the systems and technologies for processing and securing customers' data had security vulnerabilities.

## COUNT 6
### Strict Liability

76.     Plaintiffs and the AB Acquisition Subclass incorporate by reference the foregoing allegations as though fully set forth herein.

77.     AB Acquisition failed adequately to safeguard the private and confidential financial and personal information of their customers entrusted to them in the course of purchases made with debit cards and credit cards during the Relevant Period.

78.     Payment by debit or credit card increasingly is a necessity for consumers.  Lack of such means of payment increasingly limits their purchase options and bargaining power. Retailers like Defendants are eager to accept credit cards—and pay credit card companies handsomely for that privilege—because customers using credit cards spend more money than those paying with cash.

79.     Increasing reliance on electronic means of payment and other recording of personal identity and financial data has left consumers increasingly susceptible to personal data and identity theft, the adverse consequences of which are also of increasing severity.

80.     Safeguarding private and confidential data of others in their possession is solely within the control of the recipients of that data, who are best able to distribute the cost of maintaining the security of that data and the consequences of the breach of such security.

81.     The AB Acquisition Plaintiffs confided and entrusted their private and confidential financial and personal information to AB Acquisition solely for the purpose of effectuating payment for purchases made from AB Acquisition and with the expectation that AB Acquisition would strictly maintain the confidentiality of the information and safeguard it from theft or misuse.

82.     The AB Acquisition Plaintiffs did not contribute in any way to the breach of AB Acquisition's information technology systems or the compromise or theft of their private and confidential financial and personal data.  Accordingly, AB Acquisition should be held strictly liable for the loss and damage suffered by the AB Acquisition Plaintiffs resulting from AB Acquisition's failure to safeguard and maintain the confidentiality of their financial and personal data.

**COUNT 7**
**Breach of Fiduciary Duty**

83.     The AB Acquisition Plaintiffs incorporate by reference the foregoing allegations as though fully set forth herein.

84.     The AB Acquisition Plaintiffs entrusted private and confidential financial and personal information to the AB Acquisition and placed trust and confidence in AB Acquisition in order to make payments.

85.     AB Acquisition had the benefit of a disparity of position and control and the AB Acquisition Plaintiffs placed trust and confidence in AB Acquisition.

86.     AB Acquisition had a duty to maintain the confidentiality of the private and confidential financial and personal information, to safeguard and protect it from misuse by unauthorized persons.

87.     AB Acquisition breached this duty by failing to take necessary measures to maintain the confidentiality of the AB Acquisition Plaintiffs' private and confidential financial and personal information and to safeguard and protect it from misuse by unauthorized persons.

88.     The damages sustained by the AB Acquisition Plaintiffs as described above were the direct and proximate result of AB Acquisition's breach of this fiduciary duty.

## COUNT 8
### Breach Of Implied Contract

89.    The AB Acquisition Plaintiffs incorporate by reference the foregoing allegations as though fully set forth herein.

90.    When they confided their private and confidential debit card and credit card information to AB Acquisition in order to make purchases at AB Acquisition stores, the AB Acquisition Plaintiffs entered into implied contracts with AB Acquisition under which AB Acquisition agreed to safeguard and protect all such information.

91.    The AB Acquisition Plaintiffs would not have entrusted their private and confidential financial and personal information to New Albertson's in the absence of such an implied contract.

92.    AB Acquisition breached the implied contracts by failing to safeguard such information.

93.    The damages sustained by the AB Acquisition Plaintiffs as described above were the direct and proximate result of AB Acquisition's breaches of these implied contracts.

## COUNT 9
### Negligent Misrepresentation

94.    The AB Acquisition Plaintiffs incorporate by reference the foregoing allegations as though fully set forth herein.

95.    AB Acquisition had special knowledge of the methods and flaws in the methods by which it secured customer payments. The AB Acquisition Plaintiffs did not have access to that information.  This information was material to the AB Acquisition Plaintiffs' decision to purchase products from AB Acquisition's stores.  Therefore, AB Acquisition had a duty to disclose flaws in its security methods.

96.     AB Acquisition did not disclose to the AB Acquisition Plaintiffs that AB Acquisition did not abide by industry-standard cybersecurity practices—including by failing to conduct daily log monitoring—and had other deficiencies in its cybersecurity.

97.     The AB Acquisition Plaintiffs justifiably relied on this omission, meaning that, under conditions of full disclosure, they would have paid less for the products they purchased or would not have purchased those products from AB Acquisition, at all.

## COUNT 10
### Idaho Consumer Protection Act

98.     The AB Acquisition Plaintiffs incorporate by reference the foregoing allegations as though fully set forth herein.

99.     The AB Acquisition Plaintiffs and AB Acquisition are "persons" within the meaning of Idaho Code § 48-602(1).

100.    The AB Acquisition Plaintiffs were injured by AB Acquisition's employment of deceptive acts or practices in the conduct of trade or commerce, including, among other things, uniformly failing to disclose its noncompliance with industry-standard cybersecurity practices.

101.    As a direct and proximate result of AB Acquisition's deceptive acts and practices, the AB Acquisition Plaintiffs overpaid for the goods and services that they received from AB Acquisition and have been damaged thereby.

### C.  Claims Asserted By The AB Acquisition Subclass Against Supervalu

## COUNT 11
### Unjust Enrichment

102.    The AB Acquisition Plaintiffs incorporate by reference the foregoing allegations as though fully set forth herein.

103.    Supervalu knew or should have known of its noncompliance with industry-standard cybersecurity practices, which it failed to disclose.

104.     As a result of its wrongful acts and omissions, as set forth above, Supervalu obtained a benefit from the AB Acquisition Plaintiffs in the form of payments under the Transition Services Agreements, the costs of which were passed on, in whole or part, to the AB Acquisition Plaintiffs.

105.     Supervalu realized this benefit from the AB Acquisition Plaintiffs, and accepted and retained the non-gratuitous benefits conferred by the AB Acquisition Plaintiffs, who without knowledge of Supervalu's noncompliance with industry-standard cybersecurity practices, paid a higher price for the products they purchased than they would have under conditions of full disclosure.   The AB Acquisition Plaintiffs did not confer these benefits officiously or gratuitously, and it would be inequitable and unjust for Supervalu to retain these wrongfully obtained profits.

106.     The AB Acquisition Plaintiffs are therefore entitled to restitution in an amount to be determined at trial.

### D.  Claims Asserted By The New Albertson's Subclass Against New Albertson's

### COUNT 12
### Negligence

107.     Plaintiffs and the New Albertson's Subclass (the "New Albertson's Plaintiffs") incorporate by reference the foregoing allegations as though fully set forth herein.

108.     New Albertson's owed a duty to the New Albertson's Plaintiffs to exercise reasonable care in safeguarding and protecting the personal and financial information in its possession from being compromised, lost, stolen, misused, and/or disclosed to unauthorized parties.   This duty included, among other things, designing, maintaining, and testing its security systems to ensure that the New Albertson's Plaintiffs' financial information was adequately

secured and protected.  New Albertson's further had a duty to implement processes that would detect a security breach in a timely manner.

109.    New Albertson's breached this duty to exercise reasonable care in safeguarding and protecting the New Albertson's Plaintiffs' financial data in its possession by failing to adopt, implement, and maintain adequate security measures to safeguard data; failing to adequately monitor the security of point-of-sale systems; allowing unauthorized access to the New Albertson's Plaintiffs' data; and failing to recognize in a timely manner that security had been breached.

110.    New Albertson's failures to comply with industry standards, such as PCI DSS are evidence of its negligence in failing to exercise reasonable care in safeguarding and protecting the customer data in its possession.

111.    But for New Albertson's wrongful and negligent breach of duties owed to the New Albertson's Plaintiffs, their financial data would not have been compromised.

112.    The injury and harm suffered by the New Albertson's Plaintiffs was the reasonably foreseeable result of New Albertson's failure to exercise reasonable care in safeguarding and protecting the financial data collected from customers.  New Albertson's knew or should have known that the systems and technologies for processing and securing customers' data had security vulnerabilities.

## COUNT 13
## Strict Liability

113.    The New Albertson's Plaintiffs incorporate by reference the foregoing allegations as though fully set forth herein.

114.   New Albertson's failed adequately to safeguard the private and confidential financial and personal information of its customers entrusted to them in the course of purchases made with debit cards and credit cards during the Relevant Period.

115.   Payment by debit or credit card increasingly is a necessity for consumers. Lack of such means of payment increasingly limits their purchase options and bargaining power. Retailers like Defendants are eager to accept credit cards—and pay credit card companies handsomely for that privilege—because customers using credit cards spend more money than those paying with cash.

116.   Increasing reliance on electronic means of payment and other recording of personal identity and financial data has left consumers increasingly susceptible to personal data and identity theft, the adverse consequences of which are also of increasing severity.

117.   Safeguarding private and confidential data of others in their possession is solely within the control of the recipients of that data, who are best able to distribute the cost of maintaining the security of that data and the consequences of the breach of such security.

118.   The New Albertson's Plaintiffs confided and entrusted their private and confidential financial and personal information to New Albertson's solely for the purpose of effectuating payment for purchases made from New Albertson's and with the expectation that New Albertson's would strictly maintain the confidentiality of the information and safeguard it from theft or misuse.

119.   The New Albertson's Plaintiffs did not contribute in any way to the breach of New Albertson's information technology systems or the compromise or theft of their private and confidential financial and personal data. Accordingly, New Albertson's should be held strictly liable for the loss and damage suffered by the New Albertson's Plaintiffs resulting from New

Albertson's failure to safeguard and maintain the confidentiality of their financial and personal data.

## COUNT 14
### Breach of Fiduciary Duty

120.    The New Albertson's Plaintiffs incorporate by reference the foregoing allegations as though fully set forth herein.

121.    The New Albertson's Plaintiffs entrusted private and confidential financial and personal information to New Albertson's and placed trust and confidence in New Albertson's in order to make payments.

122.    New Albertson's had the benefit of a disparity of position and control and the New Albertson's Plaintiffs placed trust and confidence in New Albertson's.

123.    New Albertson's had a duty to maintain the confidentiality of the private and confidential financial and personal information, to safeguard and protect it from misuse by unauthorized persons.

124.    New Albertson's breached this duty by failing to take necessary measures to maintain the confidentiality of the New Albertson's Plaintiffs' private and confidential financial and personal information and to safeguard and protect it from misuse by unauthorized persons.

125.    The damages sustained by the New Albertson's Plaintiffs as described above were the direct and proximate result of New Albertson's's breach of this fiduciary duty.

## COUNT 15
### Breach Of Implied Contract

126.    The New Albertson's Plaintiffs incorporate by reference the foregoing allegations as though fully set forth herein.

127.    When they confided their private and confidential debit card and credit card information to New Albertson's in order to make purchases at New Albertson's stores, the New Albertson's Plaintiffs entered into implied contracts with New Albertson's under which New Albertson's agreed to safeguard and protect all such information.

128.    The New Albertson's Plaintiffs would not have entrusted their private and confidential financial and personal information to New Albertson's in the absence of such an implied contract.

129.    New Albertson's breached the implied contracts by failing to safeguard such information.

130.    The damages sustained by the New Albertson's Plaintiffs as described above were the direct and proximate result of New Albertson's breaches of these implied contracts.

## COUNT 16
### Negligent Misrepresentation

131.    The New Albertson's Plaintiffs incorporate by reference the foregoing allegations as though fully set forth herein.

132.    New Albertson's had special knowledge of the methods and flaws in the methods by which it secured customer payments.  The New Albertson's Plaintiffs did not have access to that information.  This information was material to the New Albertson's Plaintiffs' decision to purchase products from New Albertson's stores.  Therefore, New Albertson's had a duty to disclose flaws in its security methods.

133.    New Albertson's did not disclose to the New Albertson's Plaintiffs that New Albertson's did not abide by industry-standard cybersecurity practices—including by failing to conduct daily log monitoring—and had other deficiencies in its cybersecurity.

134.     The New Albertson's Plaintiffs justifiably relied on this omission, meaning that, under conditions of full disclosure, they would have paid less for the products they purchased or would not have purchased those products from New Albertson's at all.

## COUNT 17
### Idaho Consumer Protection Act

135.     The New Albertson's Plaintiffs incorporate by reference the foregoing allegations as though fully set forth herein.

136.     The New Albertson's Plaintiffs and New Albertson's are "persons" within the meaning of Idaho Code § 48-602(1).

137.     The New Albertson's Plaintiffs were injured by New Albertson's employment of deceptive acts or practices in the conduct of trade or commerce, including, among other things, uniformly failing to disclose its noncompliance with industry-standard cybersecurity practices.

138.     As a direct and proximate result of New Albertson's deceptive acts and practices, the New Albertson's Plaintiffs overpaid for the goods and services that they received from New Albertson's and have been damaged thereby.

## VII.    RELIEF REQUESTED

WHEREFORE, Plaintiffs, individually and on behalf of the Class, respectfully request that the Court enter judgment in their favor as follows:

A.  Certify this matter as a class action, appoint Plaintiffs' attorneys as class counsel, and issue notice to the Class;

B.  Enter judgment in favor of Plaintiffs and the Class against Defendants;

C.  Award to Plaintiffs and Class members actual, statutory, and punitive damages;

D.  Award appropriate pre- and post-judgment interest;

E.  Grant an award of reasonable attorney's fees and other litigation costs reasonably incurred, including expert witness fees; and

F.  Award any and all other relief to which Plaintiffs and the Class may be entitled.

## VIII.   JURY DEMAND

Plaintiffs demand a trial by jury on all claims so triable.


Dated:  August 29, 2014                          Respectfully submitted,

                                                 _/s/ Whitney Street_____ _
                                                 Whitney E. Street (BBO# 677564)
                                                 Joel A. Fleming (BBO# 685285)
                                                 Block & Leviton LLP
                                                 155 Federal Street, Suite 400
                                                 Boston, Massachusetts  02110
                                                 Tel:  (617) 398-5600
                                                 Fax:  (617) 507-6020
                                                 Whitney@blockesq.com
                                                 Joel@blockesq.com

                                                 *Counsel for Plaintiffs*

**EXHIBIT A**



**List of SUPERVALU Stores Impacted Between June 22, 2014 and July 17, 2014**

| STORE NAME | ADDRESS | CITY | STATE |
|---|---|---|---|
| HORNBACHER'S | 101 11TH ST. SOUTH | MOORHEAD | MN |
| HORNBACHER'S | 2510 BROADWAY | FARGO | ND |
| HORNBACHER'S | 4101 13TH AVE SOUTHWEST | FARGO | ND |
| HORNBACHER'S | 1532 32ND AVE SOUTH | FARGO | ND |
| HORNBACHER'S | 4151 45TH STREET SOUTH | FARGO | ND |
| CUB FOODS | 1512 SW ROUTE 26 | FREEPORT | IL |
| CUB FOODS | 15350 CEDAR AVE. S | APPLE VALLEY | MN |
| CUB FOODS | 3717 LEXINGTON AVE NORTH | ARDEN HILLS | MN |
| CUB FOODS  LIQUOR STORE | 3717 LEXINGTON AVE NORTH | ARDEN HILLS | MN |
| CUB FOODS | 12595 CENTRAL AVE N.E | BLAINE | MN |
| CUB FOODS | 585 NORTHTOWN DRIVE | BLAINE | MN |
| CUB FOODS | 4205 PHEASANT RIDGE DR | BLAINE | MN |
| CUB FOODS | 8421 SOUTH LYNDALE AVE | BLOOMINGTON | MN |
| CUB FOODS LIQUOR STORE | 8421 SOUTH LYNDALE AVE | BLOOMINGTON | MN |

| STORE NAME | ADDRESS | CITY | STATE |
|---|---|---|---|
| | | | |
| CUB FOODS | 9655 COLORADO LANE NORTH | BROOKLYN PARK | MN |
| CUB FOODS | 7555 WEST BROADWAY | BROOKLYN PARK | MN |
| CUB FOODS LIQUOR STORE | 7555 WEST BROADWAY | BROOKLYN PARK | MN |
| CUB FOODS | 300 TRAVERLERS TR. EAST | BURNSVILLE | MN |
| CUB FOODS | 1750 WEST COUNTY RD 42 | BURNSVILLE | MN |
| CUB FOODS LIQUOR STORE | 1750 WEST COUNTY RD 42 | BURNSVILLE | MN |
| CUB FOODS | 100 OPPORTUNITY BLVD | CAMBRIDGE | MN |
| CUB FOODS | 8600 NORTH 114TH AVENUE | CHAMPLIN | MN |
| CUB FOODS | 7900 MARKET BLVD | CHANHASSEN | MN |
| CUB FOODS | 2050 NORTHDALE BLVD | COON RAPIDS | MN |
| CUB FOODS | 8690 EAST POINT DOUGLAS | COTTAGE GROVE | MN |
| CUB FOODS | 5301 36TH AVENUE NORTH | CRYSTAL | MN |
| CUB FOODS | 615 W. CENTRAL ENTRANCE | DULUTH | MN |
| CUB FOODS | 1940 CLIFF LAKE ROAD | EAGAN | MN |
| CUB FOODS | 1020 DIFFLEY ROAD | EAGAN | MN |
| CUB FOODS LIQUOR STORE | 1016 DIFFLEY ROAD | EAGAN | MN |
| CUB FOODS | 2013 BROADWAY AVE WEST | FOREST LAKE | MN |
| CUB FOODS | 246 57TH AVE NE | FRIDLEY | MN |

-2-

| STORE NAME | ADDRESS | CITY | STATE |
|---|---|---|---|
| CUB FOODS | 1729 MARKET BLVD | HASTINGS | MN |
| CUB FOODS | 7850 CAHILL AVE | INVER GROVE | MN |
| CUB FOODS | 7435 179TH ST | LAKEVILLE | MN |
| CUB FOODS | 20250 HERITAGE DRIVE | LAKEVILLE | MN |
| CUB FOODS | 1800 MADISON AVE | MANKATO | MN |
| CUB FOODS | 1200 S. RIVERFRONT ROAD | MANKATO | MN |
| CUB FOODS | 8150 WEDGEWOOD LANE | MAPLE GROVE | MN |
| CUB FOODS | 100 WEST COUNTY ROAD B | MAPLEWOOD | MN |
| CUB FOODS LIQUOR-STORE | 100 WEST COUNTY ROAD B | MAPLEWOOD | MN |
| CUB FOODS | 2390 WHITE BEAR AVE. NO | MAPLEWOOD | MN |
| CUB FOODS | 216 7TH STREET WEST | MONTICELLO | MN |
| CUB FOODS | 2600 RICE CREEK | NEW BRIGHTON | MN |
| CUB FOODS | 2423 SOUTH HWY. 3 | NORTHFIELD | MN |
| CUB FOODS | 4445 NATHAN LANE | PLYMOUTH | MN |
| CUB FOODS LIQUOR STORE | 4445 NATHAN LANE | PLYMOUTH | MN |
| CUB FOODS | 3550 VICKSBURG LANE N | PLYMOUTH | MN |
| CUB FOODS | 1021 15TH AVE S.E | ROCHESTER | MN |
| CUB FOODS | 3784 150TH STREET WEST | ROSEMOUNT | MN |

| STORE NAME | ADDRESS | CITY | STATE |
|---|---|---|---|
| CUB FOODS LIQUOR STORE | 3784 150TH STREET WEST | ROSEMOUNT | MN |
| CUB FOODS. | 2100 NORTH SNELLING AVE | ROSEVILLE | MN |
| CUB FOODS | 14075 HIGHWAY 13 | SAVAGE | MN |
| CUB FOODS | 1198 VIERLING DRIVE EAST | SHAKOPEE | MN |
| CUB FOODS LIQUOR STORE | 1262 VIERLING DR | SHAKOPEE | MN |
| CUB FOODS | 23800 STATE HWY 7 | SHOREWOOD | MN |
| CUB FOODS | 3930 SILVER LAKE ROAD | ST.ANTHONY | MN |
| CUB FOODS | 1801 MARKET DRIVE | STILLWATER | MN |
| CUB FOODS LIQUOR STORE | 1801 MARKET DRIVE | STILLWATER | MN |
| CUB FOODS | 1177 CLARENCE STREET | ST.PAUL | MN |
| CUB FOODS | 2197 HUDSON ROAD | ST. PAUL | MN |
| CUB FOODS | 1440 UNIVERSITY AVENUE | ST.PAUL | MN |
| CUB FOODS | 1059 MEADOWLANDS DR | WHITE BEAR LAKE | MN |
| CUB FOODS | 2201 1ST STREET SOUTH | WILLMAR | MN |
| CUB FOODS | 8432 TAMARACK VILLAGE | WOODBURY | MN |
| FARM FRESH | 683 S HUGHES BLVD | ELIZABETH CITY | NC |
| FARM FRESH | 309 S BATTLEFIELD BLVD | CHESAPEAKE | VA |
| FARM FRESH | 701-A N. BATTLEFIELD BLVD | CHESAPEAKE | VA |
| FARM FRESH | 1620 CEDAR RD STE 100 | CHESAPEAKE | VA |
| FARM FRESH | 1400 KEMPSVILLE ROAD | CHESAPEAKE | VA |

| STORE NAME | ADDRESS | CITY | STATE |
|---|---|---|---|
| FARM FRESH | 1464 MT. PLEASANT ROAD | CHESAPEAKE | VA |
| FARM FRESH | 211-15 PROVIDENCE ROAD | CHESAPEAKE | VA |
| FARM FRESH | 3353 WESTERN BRANCH BLVD | CHESPEAKE | VA |
| FARM FRESH | 1459 AMORY DRIVE | FRANKLIN | VA |
| FARM FRESH | 6500-C GEORGE WASHINGTON | GRAFTON | VA |
| FARM FRESH | 2190 COLISEUM DRIVE | HAMPTON | VA |
| FARM FRESH | 227 FOX HILL RD | HAMPTON | VA |
| FARM FRESH | 608 E MERCURY BLVD | HAMPTON | VA |
| FARM FRESH | 30 TOWN CENTRE WAY | HAMPTON | VA |
| FARM FRESH | US HWY 17/ GLOUCHESTER | HAYES | VA |
| FARM FRESH | 4000 VICTORY BLVD | PORTSMOUTH | VA |
| FARM FRESH | 460 WYTHE CREEK RD | POQUOSON | VA |
| FARM FRESH | 200 ARTHURS WAY | NEWPORT NEWS | VA |
| FARM FRESH | 353 CHATHUM DR | NEWPORT NEWS | VA |
| FARM FRESH | 730 W 21ST STREET | NORFOLK | VA |
| FARM FRESH | 601 CHILDREN'S LANE | NORFOLK | VA |
| FARM FRESH | 201 EAST BERKLEY AVENUE | NORFOLK | VA |
| FARM FRESH | 230 EAST LITTLE CREEK RD | NORFOLK | VA |

| STORE NAME | ADDRESS | CITY | STATE |
|---|---|---|---|
| FARM FRESH | 1200 N. MILITARY HWY | NORFOLK | VA |
| FARM FRESH | 179 W.OCEAN VIEW AVE | NORFOLK | VA |
| FARM FRESH | 2320 E. MAIN STREET | RICHMOND | VA |
| FARM FRESH | 1282 SMITHFIELD PLAZA | SMITHFEILD | VA |
| FARM FRESH | 3575 BRIDGE ROAD | SUFFOLK | VA |
| FARM FRESH | 1401 N MAIN STREET | SUFFOLK | VA |
| FARM FRESH | 799 CHIMNEY HILL SHOPPING CENTER | VIRGINIA BEACH | VA |
| FARM FRESH | 928 DIAMOND SPRINGS ROAD | VIRGINIA BEACH | VA |
| FARM FRESH | 1385 FORDHAM DRIVE | VIRGINIA BEACH | VA |
| FARM FRESH | 1615 GENERAL BOOTH BLVD | VIRGINIA BEACH | VA |
| FARM FRESH | 2129 GENERAL BOOTH BLVD | VIRGINIA BEACH | VA |
| FARM FRESH | 2110 GREAT NECK SHOPPING CENTER | VIRGINA BEACH | VA |
| FARM FRESH | 1069 INDEPENDENCE BLVD | VIRGINIA BEACH | VA |
| FARM FRESH | 2058 S INDEPEDENCE | VIRGINIA BEACH | VA |
| FARM FRESH | 521 LASKIN ROAD | VIRGINIA BEACH | VA |
| FARM FRESH | 4872 PRINCESS ANNE RD | VIRGINIA BEACH | VA |
| FARM FRESH | 4001 VIRGINIA BEACH BLVD | VIRGINIA BEACH | VA |

| STORE NAME | ADDRESS | CITY | STATE |
|---|---|---|---|
| FARM FRESH | 4511 JOHN TYLER HWY | WILLIAMSBURG | VA |
| FARM FRESH | 455 MERRIMAC TRAIL | WILLIAMSBURG | VA |
| FARM FRESH | 115 NORGE LANE | WILLIAMSBURG | VA |
| SHOP 'N SAVE | 1721 HOMER ADAMS PARKWAY | ALTON | IL |
| SHOP 'N SAVE | 800 CARLYLE AVE | BELLEVILLE | IL |
| SHOP 'N SAVE | 4201 NORTH BELT WEST | BELLEVILLE | IL |
| SHOP 'N SAVE | 68 NORTH BELLWOOD DR | BETHALTO | IL |
| SHOP 'N SAVE | 1028 CAMP JACKSON RD | CAHOKIA | IL |
| SHOP 'N SAVE | 9529 COLLINSVILLE RD | COLLINSVILLE | IL |
| SHOP 'N SAVE | 717 VANDALIA ROAD | COLLINSVILLE | IL |
| SHOP 'N SAVE | 634 BERKSHIRE BLVD | EAST ALTON | IL |
| SHOP 'N SAVE | 2122 TROY ROAD | EDWARDSVILLE | IL |
| SHOP'N SAVE | 3521 NAMEOKI COMMONS | GRANITE CITY | IL |
| SHOP 'N SAVE | 943 SOUTH STATE ST | JERSEYVILLE | IL |
| SHOP 'N SAVE | 5001 N BIG HOLLOW RD | PEORIA | IL |
| SHOP 'N SAVE | 200 NORTH GRAND WEST | SPRINGFIELD | IL |
| SHOP 'N SAVE | 1501 SOUTH DIRKSEN | SPRINGFIELD | IL |
| SHOP 'N SAVE | 1755 WABASH | SPRINGFIELD | IL |

| STORE NAME | ADDRESS | CITY | STATE |
|---|---|---|---|
| SHOP 'N SAVE | 1900 EAST EDWARDSVILLE | WOOD RIVER | IL |
| SHOP 'N SAVE | 1253 WATER TOWER PLACE | ARNOLD | MO |
| SHOP 'N SAVE | 301 WATSON PLAZA | CRESTWOOD | MO |
| SHOP 'N SAVE | 7909 HIGHWAY N | DARDENNE PRAIRIE | MO |
| SHOP 'N SAVE | 15446 MANCHESTER | ELLISVILLE | MO |
| SHOP 'N SAVE | 45 GRAVOS BLUFFS DRIVE | FENTON | MO |
| SHOP 'N SAVE | 10805 OLD HALLS FERRY RD | FERGUSON | MO |
| SHOP 'N SAVE | 49 N. FLORISSANT RD | FERGUSON | MO |
| SHOP 'N SAVE | 1275 N. TRUMAN BLVD | FESTUS | MO |
| SHOP 'N SAVE | 175 FLOWER VALLEY SHOPPING CENTER | FLORISSANT | MO |
| SHOP N SAVE | 2183 CHARBONIER ROAD | FLORISSANT | MO |
| SHOP 'N SAVE | 196 MAYFAIR PLAZA | FLORISSANT | MO |
| SHOP'N SAVE | 1023 CROSSROADS PLACE | HIGH RIDGE | MO |
| SHOP 'N SAVE | 10461 MANCHESTER RD | KIRKWOOD | MO |
| SHOP 'N SAVE | 1032 LEMAY FERRY RD | LEMAY | MO |
| SHOP 'N SAVE | 7355 MANCHESTER RD | MAPLEWOOD | MO |
| SHOP'N SAVE | 9521 LEWIS & CLARK | MOLINE ACRES | MO |

| STORE NAME | ADDRESS | CITY | STATE |
|---|---|---|---|
| SHOP 'N SAVE | 1421 MEXICO LOGO RD EAST | O'FALLON | MO |
| SHOP 'N SAVE | 3740 MONTICELLO PLAZA | O'FALLON | MO |
| SHOP 'N SAVE | 10634 ST. CHARLES ROCK | ST. ANN | MO |
| SHOP 'N SAVE | 60 HARVESTER SQUARE | ST CHARLES | MO |
| SHOP'N SAVE | 9070 ST. CHARLES ROCK RD | ST. JOHNS | MO |
| SHOP 'N SAVE | 4660 CHIPPEWA | ST. LOUIS | MO |
| SHOP 'N SAVE | 7057 CHIPPEWA | ST. LOUIS | MO |
| SHOP'N SAVE | #162 GRAVOIS PLAZA | ST. LOUIS | MO |
| SHOP N SAVE | 1144 MERAMCE STATION RD | ST LOUIS | MO |
| SHOP 'N SAVE | 4447 NATURAL BRIDGE | ST LOUIS | MO |
| SHOP 'N SAVE | 5780 SOUTH LINDBERGH | ST. LOUIS | MO |
| SHOP 'N SAVE | 100 JUNGERMAN RD | ST. PETERS | MO |
| SHOP 'N SAVE | 500 HIGHWAY 50 WEST | UNION | MO |
| SHOPPERS | 2371 SOLOMONS ISLAND RD | ANNAPOLIS | MD |
| SHOPPERS | 5457 BALTIMORE NATIONAL | BALTIMORE | MD |
| SHOPPERS | 1200 EASTERN AVE | BALTIMORE | MD |
| SHOPPERS | 6500 EASTERN AVE | BALTIMORE | MD |
| SHOPPERS | 857 E FORT AVE | BALTIMORE | MD |

| STORE NAME | ADDRESS | CITY | STATE |
|---|---|---|---|
| SHOPPERS | 803 GOUCHER BLVD | BALTIMORE | MD |
| SHOPPERS | 2000 GWYNNS FALLS PKWY | BALTIMORE | MD |
| SHOPPERS | 1955 E JOPPA ROAD | BALTIMORE | MD |
| SHOPPERS | 8212 LIBERTY RD | BALTIMORE | MD |
| SHOPPERS | 5722 RITCHIE HWY | BALTIMORE | MD |
| SHOPPERS | 2801 SMITH AVE | BALTIMORE | MD |
| SHOPPERS | 22599 MCARTHUR BLVD | CALIFORNIA | MD |
| SHOPPERS | 4801 MARLBORO PIKE | CAPITOL HEIGHTS | MD |
| SHOPPERS | 6300 COVENTRY WAY | CLINTON | MD |
| SHOPPERS | 4720 CHERRY HILL RD | COLLEGE PARK | MD |
| SHOPPERS | 3831 BLADENSBURG RD | COLMAR MANOR | MD |
| SHOPPERS | 1649 CROFTON SQUARE | CROFTON | MD |
| SHOPPERS | 3301 NORTH RIDGE ROAD #4 | ELLICOTT CITY | MD |
| SHOPPERS | 2950 DONNELL ST | FORESTVILLE | MD |
| SHOPPERS | 5820 SILVER HILL RD | FORESTVILLE | MD |
| SHOPPERS | 18066 MATENY RD | GERMANTOWN | MD |
| SHOPPERS | 2441 CHILLUM RD | HYATTSVILLE | MD |
| SHOPPERS | 5110 NICHOLSON LANE | KENSINGTON | MD |

| STORE NAME | ADDRESS | CITY | STATE |
|---|---|---|---|
| SHOPPERS | 7051 MARTIN LUTHER KING JR. HWY | LANDOVER | MD |
| SHOPPERS | 10501 MARTIN LUTHER KING | LANHAM | MD |
| SHOPPERS | 806 LARGO CENTER DR | LARGO | MD |
| SHOPPERS | 13600 BALTIMORE AVE | LAUREL | MD |
| SHOPPERS | 3441 FORT MEADE RD. | LAUREL | MD |
| SHOPPERS | 670 OLD MILL RD RTE 3 | MILLERSVILLE | MD |
| SHOPPERS | 7790 RIVERDALE RD | NEW CARROLLTON | MD |
| SHOPPERS | 18140 VILLAGE MART DR | OLNEY | MD |
| SHOPPERS | 6111 LIVINGSTON RD | OXON HILL | MD |
| SHOPPERS | 8048 RITCHIE HWY | PASADENA | MD |
| SHOPPERS | 7858 QUARTERFIELD RD | SEVERN | MD |
| SHOPPERS | 6300 GEORGETOWN BLVD | SYKESVILLE | MD |
| SHOPPERS | 6881 NEW HAMPSHIRE AVE | TAKOMA PARK | MD |
| SHOPPERS | 1170 SMALLWOOD DR. W | WALDORF | MD |
| SHOPPERS | 551 JERMOR LANE | WESTMINSTER | MD |
| SHOPPERS | 2201 RANDOLPH ROAD | WHEATON | MD |
| SHOPPERS | 3801 JEFF DAVIS HWY | ALEXANDRIA | VA |

| STORE NAME | ADDRESS | CITY | STATE |
|---|---|---|---|
| SHOPPERS | 6200 LITTLE RIVER TURNPIKE | ALEXANDRIA | VA |
| SHOPPERS | 7660 RICHMOND HWY | ALEXANDRIA | VA |
| SHOPPERS | 9274 OLD KEENE MILL RD | BURKE | VA |
| SHOPPERS | 6335 MULTIPLEX DR | CENTREVILLE | VA |
| SHOPPERS | 4174 FORTUNA CENTER PLAZA | DUMFRIES | VA |
| SHOPPERS | 9622 MAIN STREET | FAIRFAX | VA |
| SHOPPERS | 6360 SEVEN CORNERS CENTER | FALLS CHURCH | VA |
| SHOPPERS | 7005 MANCHESTER LAKES | FRANCONIA | VA |
| SHOPPERS | 2425 CENTREVILLE RD | HERNDON | VA |
| SHOPPERS | 1079 EDWARDS FERRY RD NE | LEESBURG | VA |
| SHOPPERS | 9409 LORTON MARKET ST | LORTON | VA |
| SHOPPERS | 9540 LIBERIA AVE | MANASSAS | VA |
| SHOPPERS | 10864 SUDLEY MANOR DR | MANASSAS | VA |
| SHOPPERS | 1505 STAFFORD MARKET PL | STAFFORD | VA |
| SHOPPERS | 47100 COMMUNITY PLAZA | STERLING | VA |
| SHOPPERS | 14000 SHOPPERS BEST WAY | WOODBRIDGE | VA |
|  |  |  |  |